**G. T. and Leola F. ROWE, et al.**

v.

**The UNITED STATES.**

No. 372–78.

United States Court of Claims.

July 15, 1981.

John Y. Merrell, Jr., McLean, Va., for plaintiffs; John Y. Merrell, McLean, Va., attorney of record. Timothy J. Callahan, McLean, Va., of counsel.

Michael V. Marino, Washington, D.C., with whom was Acting Asst. Atty. Gen., John F. Murray, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and SMITH, Judges.

ON CROSS–MOTIONS FOR
SUMMARY JUDGMENT

DAVIS, Judge.

This tax refund suit raises the question of whether, in determining "gross income

from mining" for coal depletion, plaintiff coal mine owners are required to exclude costs incurred in transporting coal from their mines to the processing facility where the coal is bought by a third-party-owner of the facility, and then processed for use by and sold to consumers. We conclude that such transportation expenses are deductible from gross income in computing depletion allowances, and therefore hold for the Government.

Taxpayers are G. T. Rowe, Howard Hamilton, Floyd Hensley (and their respective spouses).[1] All three were general partners in the Ben Mining Company and Mr. Rowe and Mr. Hamilton were partners in the Mink Gap Coal Company. These coal partnerships were engaged in the strip-mining of coal. They did not perform treatment processes (such as cleaning, breaking, sizing, dust allaying, and freezing prevention) on their coal. Rather, they transported the coal 20 miles or less to the premises of the Virginia Iron Coal and Coke Company (VICC). VICC then inspected the coal, and if it was acceptable, bought it, and then cleaned, broke, sized, weighed and shipped (and sold) it to VICC's customers.

In plaintiffs' 1973 tax return they computed their gross income from mining for depletion purposes (based on the gross amount realized from coal sales, minus nonmining expenses such as royalty payments) without subtracting, as a nonmining expense, cost incurred by the coal partnerships in transporting their coal from the mine sites to VICC. The Internal Revenue Service disallowed the inclusion of such transportation costs in gross income from mining, and as a result, plaintiffs' depletion allowances were decreased and they paid an additional $7,014.60 in income taxes. In March 1978, their refund claims were fully disallowed, and in August 1978 they brought the present suit, which is properly before us on the parties' cross-motions for summary judgment (there is no dispute as to the facts).

**I**

■ The precise question—the status of the costs of transporting taxpayers' coal from their mines to VICC's processing center—is ultimately determined by the intricate provisions of the depletion legislation and regulations. We have no alternative to threading our way, step-by-step, through their complexities.

Section 611(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 611(a), provides that, for the computation of taxable income in the case of mines, there shall be a deduction equal to "a reasonable allowance for depletion." Under section 613, the percentage allowed for depletion (under section 611) for coal mining is ten percent "of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." 26 U.S.C. § 613(a), (b)(4). Where coal is the depletable property, "gross income from the property" is defined as "gross income from mining." 26 U.S.C. § 613(c)(1). "Mining," in turn, encompasses more than just "extraction of the ores or minerals from the ground * * *." 26 U.S.C. § 613(c)(2). It also includes

> the treatment processes considered as mining described in paragraph (4) [of section 613(c)] (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals * * * from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles * * *. [Id. (emphasis added).]

With reference to what treatment processes are considered to be mining for purposes of section 613 depletion, section 613(c)(4) says:

> [t]he following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled

---

1. The wives are parties to this action by reason of their having filed joint federal income tax returns for 1973 with their husbands. In this opinion, the terms "plaintiffs" or "taxpayers" will refer only to Messrs. Rowe, Hamilton and Hensley.

to a deduction for depletion under section 611:

> (A) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment * * *. [emphasis added.]

It is clear that this scheme allows the inclusion in gross income from coal mining of certain transportation costs in defined circumstances. But transportation is a component of mining only "from the point of extraction" to the place where "*such treatment processes are applied thereto*" (emphasis added)—those processes being specifically described as "the treatment processes considered as mining described in paragraph (4)" of section 613(c). 26 U.S.C. § 613(c)(2).[2] The narrow pin-pointed issue is the exact meaning of the phrase: "the treatment processes considered as mining *described in paragraph 4*". (emphasis added).

Plaintiffs would have us look only to whether the actual treatment received by their coal is of the general type envisioned by section 613(c)(4)—and there is no disagreement that that type of treatment was given to coal from plaintiffs' mines at the VICC plant. The Government, on the other hand, says that transportation to the unconnected place of those processes is included only where the treatment processes are carried on by the mine owners (such as plaintiffs) themselves.

We think that the words of the legislation, taken by themselves and read literally, favor defendant. The statute requires that, to be considered as "mining" (*see* note 2, *supra*), cleaning, breaking, and other comparable processes must be "*applied by the mine owner or operator.*" (emphasis added). 26 U.S.C. § 613(c)(4).[3] Conversely put, the only treatment processes to be included in "mining" are those "described in paragraph (4)" (*see* note 2, *supra*) and paragraph 4 describes the treatment processes as only those "applied by the mine owner or operator" himself. (*see* note 3, *supra*). It is undisputed that plaintiffs' coal was sold to VICC before the types of treatment enumerated in section 613(c)(4)(A), note 3, *supra*, were applied to it. The textual conclusion is therefore that, since the processes were not applied by the mine owner or operator (*i. e.* taxpayers) as required by section 613(c)(4), the transportation to the processing plant does not fall within "mining" or "gross income from mining" (*see* note 2, *supra*)—the plaintiffs' transportation to the purchaser's processing plant cannot therefore be included in taxpayers' depletion base. This is literally what the words of the statute say.

This literal reading of the statute is much bolstered by the Treasury regulations. *See* 26 C.F.R. § 1.613-4. These directives "command our respect * * * [and] 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" *Commissioner v. Portland Cement Co.*, 450 U.S. 156, at 169, 101 S.Ct. 1037 at 1045, 67 L.Ed.2d 140 (1981). This is especially true in depletion. On this point the Supreme Court recently said in *Portland Cement*:

> Indeed, our customary deference to Treasury Regulations is particularly appropriate in this case [involving mining deple-

2. Section 613(c)(2) provides:

*Mining.*—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

3. Subsection or paragraph 4 of section 613(c) provides:

(4) *Treatment processes considered as mining.*—The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611:

(A) in the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing and loading for shipment * * *.

tion], for the Court previously has recognized the necessity of a "broad rule-making delegation" of authority in the area of depletion: "As Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion, it delegated to the Commissioner the duty of making the regulations." *Douglas v. Commissioner*, 322 U.S. 275, 280, 281, 64 S.Ct. 988, 991, 992, 88 L.Ed. 1271 (1944) * * *. [*Id.*]

To us, the complex depletion regulations, when attentively followed, make it quite plain that the transportation at issue here is not to be included in gross depletable income.

Regulation 1.613–4(a) defines "gross income from mining" as "that amount of income which is attributable to the extraction of the ores or minerals from the ground and the application of mining processes, including mining transportation." Subsection (a) goes on to state that for section 613 purposes,

"treatment processes considered as mining" * * * will be referred to as "mining processes." Processes, including packaging and *transportation* which do *not* qualify as mining will be referred to as "nonmining processes." [emphasis added.]

With respect to transportation under section 613, the regulation continues:

transportation which qualifies as "mining" will be referred to as "mining transportation" and transportation which does not qualify as "mining" will be referred to as "nonmining transportation."

"Mining" is then defined in subsection (f)(1) of 1.613–4 to include only three elements:

(i) The extraction of ores or minerals from the ground;

(ii) Mining processes, as described in subparagraphs (2) through (6) of this paragraph; and

(iii) So much of the transportation (whether or not by common carrier) of ores or minerals from the point of extraction of the ores or minerals from the ground *to the plants or mills in which the processes referred to in subdivision (ii) of*

*this subparagraph are applied thereto* as is not in excess of 50 miles * * *. [emphasis added.]

This definition includes transportation only from the point of extraction to the plants or mills in which "mining processes" are applied. "Mining processes" as used in section 1.613–4(f)(1)(ii) is defined by section 1.613–4(f)(2)(i) and (iv):

(i) * * * "[M]ining processes" means, * * for taxable years beginning after December 31, 1960, the following processes (and the processes necessary or incidental thereto):

(a) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;

\*    \*    \*    \*    \*    \*

(iv) *The term "mining" does not include purchasing minerals from another.* Accordingly, the processes listed in this paragraph shall be considered as *mining processes only to the extent that they are applied by a mine owner or operator* to an ore or mineral in respect of which he is entitled to a deduction for depletion under section 611. *The application of these processes to purchased ores, minerals, or materials does not constitute mining.* [emphasis added.]

Under this regulation, treatment processes applied to coal by a purchaser, rather than by the mine owner or operator himself, are not "mining processes." And it is beyond dispute that only transportation to the place where "mining processes" are applied is includable in gross income from mining. 26 C.F.R. § 1.613–4(f)(1), *supra.* Since "mining processes" (in the regulation's sense) are not applied to these plaintiffs' coal, the transportation to VICC's docks is excludable nonmining transportation. *See* 26 C.F.R. § 1.613–4(a), *supra.*

The point is strengthened by the regulation's converse description of "nonmining processes" in 1.613–4(g). Subsection (3) of that provision specifically declares that "[t]ransportation the primary purpose of which is marketing, distribution, or *delivery for the application of only nonmining processes shall not be considered as min-*

*ing.*" (emphasis added). Because plaintiffs did not apply "mining processes" (other than extraction) to their coal, the transportation of that coal to purchaser VICC for "nonmining processes" constituted "nonmining transportation" which was not includable in "gross income from mining."

Consistently with their position that the statute does not require that mining processes be applied by the mine owner or operator, plaintiffs argue that transportation is includable under the regulation where the destination is "the plants or mills in which the processes referred to in [section 1.613–4(f)(1)(ii)] are applied * * *," 26 C.F.R. § 1.613–4(f)(iii), and that this regulatory language does not require the processes to be applied by the mine owner. This contention is directly contrary to the wording of section 1.613–4(f)(2)(iv), *supra*, which provides that the processes listed under section 1.613–4(f)(2)(i)(a) are "mining processes *only to the extent that they are applied by a mine owner or operator* * * *." (emphasis added). This language clearly and unambiguously requires more than an application—by anyone—of the named treatment processes to what was at one time plaintiffs' coal. And as we have said, this requirement harmonizes with the literal language of the statute.[4]

## II

In the face of this meticulous pattern of the statute and the regulations, taxpayers urge a different result on the basis of (a) their view of the legislative meaning of earlier forerunners of the present statute, and (b) considerations of legislative policy. If the thrusts of legislative background and of congressional policy on which plaintiffs call were strongly in their favor, they perhaps might win the battle despite the statute's apparently careful formulation. But we are persuaded that neither ground has enough strength.

Both sides agree that in the Public Debt and Tax Rate Extension Act of 1960, Pub.L. No.86–564, 74 Stat. 290,—which put section 613 into its current form (in the respects now involved)—Congress did not intend to change the prior law as to the exclusion or inclusion of our type of transportation in "mining" for depletion purposes. *See* H.R. Rep.No.2005, 86th Cong., 2d Sess. 8–9, 1960–2 C.B. 741, 746 (conference report), *reprinted in* [1960] U.S.Code Cong. and Ad. News 2577, 2580.[5] But there is sharp disagreement as to the impact of the prior law—plaintiffs insisting that it allowed inclusion of this type of transportation and defendant emphatically denying that proposition. Because there is nothing really conclusive in the prior statutes, regulations, court decisions, or Service rulings, we need not set out in extenso the various bits and pieces on which the parties respectively rely. Suffice it that, at the very best for taxpayers, the pre-1960 law is uncertain,

---

4. As explained more fully in Part II, *infra*, there is nothing in the legislative history of the 1960 Act (Public Debt and Tax Rate Extension Act of 1960, Pub.L.No. 86–564, 74 Stat. 290), which adopted the present language of section 613, truly running against this literal interpretation adopted by the regulations. Rather, in asserting that it was not changing the law, the conference report, H.R.Rep.No.2005, 86th Cong., 2d Sess., 9, 1960–2 C.B. 741, 746, *reprinted in* [1960] U.S.Code Cong. and Ad.News 2577, 2581, said that treatment processes are to be treated as mining where performed by another person for the mine owner or operator "*if* the mine owner or operator has *not* disposed of his depletable interest in the ore or mineral to which such process is applied," but that "a described process is not treated as mining where applied to a purchased ore or mineral." (emphasis added.) Though this statement does not cover the transportation involved here, it

does treat VICC's processing as non-mining. *See also* note 5, *infra*.

5. The prime purpose of the portion of the 1960 Act dealing with mining depletion was to change the then belief (in some quarters) that integrated miner-manufacturers could base their depletion allowance on the sales price of their manufactured products. *See Cannelton Sewer Pipe Co. v. United States*, 268 F.2d 334 (7th Cir. 1959), *rev'd*, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), and the remarks of Senator Gore. *See* 106 Cong.Rec.S. 13217 (1960). Of course, this principal objective did not prevent Congress from also acting to clarify what it apparently believed to be the prior law on the status of transportation from the mine to the processing plants. *See* note 4, *supra*.

but a respectable (though by no means clear or definitive) case can be made for their position. There are, however, no rulings, no course-of-practice, which we can say are really in their favor, nor are the previous statutes or regulations at all plainly their way. The Government's contrary position is, at least equally (and probably more so), as respectable.[6] This being so, we cannot say that the normal reading of the current law (as we understand it in Part I, *supra*), has to be, or should be, overborne by the prior law or the prior legislative background. The most we can say for plaintiffs is that the pre-1960 law was unclear in actuality—and that is not enough to prevail against the definite texts of the present law.

Nor are there sufficient policy reasons dominating (and thus modifying) the language of the statute and regulations (as described in Part I). Taxpayers' submission is that that "plain" meaning discriminates (allegedly contrary to congressional intent) against small, nonintegrated coal companies, fostering monopolistic practices—through denial of depletion credit for transportation where a coal company does not own processing facilities but granting it to integrated miner-processors. Defendant replies that its interpretation differentiates only between taxpayers (regardless of their degree of integration) who transport their coal for sale to customers, and others who transport their coal (within 50 miles) for the purpose of themselves applying "mining processes." If plaintiffs had gotten a processor who would treat the coal for taxpayers without first purchasing it, the latter could have received credit for their transportation costs to the processing facility. Defendant also points out that plaintiffs' position would allow miners in their situation to obtain depletion allowances based on a market price that includes transportation to the processing customers, but would deny that kind of allowance to miners who sold to their customers at the mine site. The Government maintains that Congress would not countenance that sort of discrimination, while plaintiffs respond that Congress ordinarily allows depletion on the whole of the mining taxpayer's first sale to his customers, and that taxpayers are not seeking depletion on value added to the coal by others.

We need not balance these opposing contentions as if we were the legislators. We see no general, overall policy in the tax-depletion legislation pushing against integration. Instead, depletion law appears to us to have been influenced by a number of different and possibly conflicting interests, some special and some more widespread. There is no all-dominating pattern, but a variety of separate adjustments. In this instance we cannot say that the reading that hugs the text of the statute and regulations necessarily leads to absurd or unwanted results. In ascertaining Congress' intent in this area, it is more helpful to look for guidance to the particular statute and regulations, rather than attempting to interpret applicable law in a distorted fashion simply to reconcile it with vague notions of overall public policy not clearly incorporated in the statute. This is especially true where, as here, the Treasury regulations are entitled to greater than usual deference because "Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion * * *." *Portland Cement, supra,* at 1045.

### III

Plaintiffs' secondary argument is that, if (as we have held in Parts I and II,

---

**6.** The difficulty is that the pre-1960 legislation (*see* then section 613(c)(2), (4) of the Code) and regulations (*see* Treas.Reg. 118, 26 C.F.R. § 39.23(m)–1(e)(3), (e)(4), (f)(1)) do not directly or specifically address the precise and narrow question of transportation by mine owners to processing plants (at some distance) owned by others to whom the mine owners sell the coal for treatment and resale to consumers. Both the statutes and regulations can be read, with little or no strain, as sustaining the defendant's present position, although they are not as precise or exact as the current version of section 613 and its regulations. The various committee reports can also be read to support the defendant's position, but again they are not very specific or exact—and plaintiffs have nonfrivolous interpretations to present in support of their contrary interpretation.

*supra*) they cannot include all of the cost of transportation from the mine to the processing facility, they are nevertheless entitled to receive credit for part of those expenses. Under this subordinate theory, the included costs arose from the movement of coal over what is known as a "bench." In the surface-mining method used by these coal partnerships, earth and coal are removed around the side of a hill, creating a flat area called the bench. After removal of the coal, the bench is used as a road for the removal of coal which lies further on, and as a means of access to the new mining area. Plaintiffs argue that the costs of moving the coal along the bench to the mine-entrance are equivalent to those incurred in connection with movement of coal along headings and haulways of a deep mine—that since costs-to-the-mine-entrance are includable in computing the depletion allowance for a deep mine, these comparable truck costs should also be allowable where movement along the bench is involved in surface-mining. We do not reach the correctness of this argument because we lack subject matter jurisdiction over this part of the case. No refund claim adequately raising this issue was filed with the Internal Revenue Service under 26 U.S.C. § 7422(a).

The elementary rule is that, under section 7422(a) no suit may be maintained in any court for taxes erroneously assessed or collected "until a claim for refund or credit has been duly filed * * *." It is not enough for purposes of this statute that some sort of claim for refund be filed.

It is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely * * * application for refund to the Internal Revenue Service cannot be considered by a court in which a suit for refund is subsequently initiated. [*Union Pacific R.R. v. United States*, 182 Ct.Cl. 103, 108, 389 F.2d 437, 442 (1968).]

Plaintiffs' individual claims for refund stated, in almost identical terms:

The Internal Revenue Service determined that the taxpayers' taxable income from Mink Gap Coal Company and Ben Mining Company, both coal mining partnerships, should be increased as a result of the disallowance of a portion of the percentage depletion deduction to which these partnerships are entitled. This disallowance is based on the *erroneous position that gross income from the property should be reduced by coal haul (transportation) costs* for the purpose of determining the allowable depletion. [emphasis added.]

It is clear that the limited claim relating to truck movement of the coal over the bench was not specifically raised in the refund claim (nor was it raised in the petition or pretrial submission in this court.) The question becomes whether it is "comprised within the general language of" the refund claim, and is therefore sufficient "to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated * * *." *Union Pacific, supra*, 182 Ct.Cl. at 108–09, 389 F.2d at 442.

Taxpayers describe their partial, alternate claim as being comprised within the words "coal haul (transportation)." Their argument is that "the portion of the coal haul which occurs over the bench and within the mine is part of gross income from the property because it is part of extracting the mineral from the ground." Since extraction of coal is dealt with by the same Code section (613(c)(2), note 2, *supra*) as the primary claim, taxpayers' contention is that, if the primary position is covered by the refund claim (as defendant concedes), so is the secondary, alternative one.

Were this an area of tax law in which the term "transportation" is used loosely and broadly, plaintiffs' argument might have some validity; in a general sense, any movement of a substance from one point to another could be called transportation. But for mining depletion "transportation" has been narrowly and exactly defined for the purposes of section 613 and its regulations. *See* 26 U.S.C. § 613(c)(2) and 26 C.F.R. § 1.613–4(a), (f), (g). There is an exact and technical usage differentiating "transporta-

tion" from "extraction." Taxpayers' briefs show that even they do not view this alternate claim as one for transportation costs in the sense of the statute or the regulation. The heading of their argument says: "Haulage over the bench of a surface mine, like haulage through the haulways of a deep mine, is part of the *extraction* of the coal." (emphasis added). Their secondary claim is based, not on the transportation aspect of mining for depletion purposes, but on mining's "extraction" aspects. In depletion, these two mining phases are separate and distinct, and are so treated in the definitional and coverage sections of 613. *See* 26 U.S.C. § 613(c)(2); 26 C.F.R. § 1.613.-4(f)(i) and (iii), as well as (a) and (g)(3). In view of these careful distinctions, we do not believe that a reference to "coal haul (transportation)" was enough to put the Service on notice of a claim which plaintiffs now emphasize is based on the extraction rather than the transportation costs of gross income from mining under section 613—a claim which is not at all covered by the "transportation" parts of the regulations. On the contrary, the inclusion of the term "transportation" would likely divert the IRS from the separate, secondary claim (one for "extraction") now pressed.

In sum, we deny plaintiffs' motion for summary judgment and grant defendant's. The petition is dismissed.